# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KITSAP COUNTY CONSOLIDATED HOUSING AUTHORITY, | No. 60724-7-II |
| Respondent, | |
| v. | |
| JORDAN ROBERTSON AND RAY JACKSON, | UNPUBLISHED OPINION |
| Appellants. | |

GLASGOW, J.—Jordan Robertson was a tenant at an apartment complex owned by Kitsap County Consolidated Housing Authority ("Housing Kitsap"). Over the course of several months, the apartment complex's property manager cited Robertson with several violations of the lease rules, including three violations for smoking outside and two violations for using abusive language with staff. Housing Kitsap then served Robertson and her long-term boyfriend, Ray Jackson, with a 60-day notice terminating Robertson's tenancy and started eviction proceedings.

At a show cause hearing for the eviction proceeding, Robertson's counsel argued that the lease's smoking policy was ambiguous as to whether the lease prohibited all outdoor smoking and as to whether a single smoking violation constituted a substantial breach of the lease. The trial court concluded that the policy unambiguously banned smoking everywhere on the apartment complex premises and issued a writ of restitution allowing Housing Kitsap to have Robertson and Jackson removed from the property. As the hearing was concluding, Jackson spoke directly to the

court and stated that he did not believe he should have been named in the action because he was not on the lease and was not a tenant of Housing Kitsap. The trial court declined to hear Jackson's defense on the grounds that he had not raised it in writing before the hearing.

Robertson and Jackson appeal. We conclude that the applicable smoking policy contained contradictory provisions that rendered the policy ambiguous, and we must interpret the ambiguous provisions in the light most favorable to the tenants. Reading the ambiguities in the smoking policy in Robertson's favor, we conclude that on this record, Housing Kitsap has not shown four serious violations of the lease as required for eviction under the Residential Landlord-Tenant Act of 1973, chapter 59.18 RCW. We therefore reverse and remand for dismissal.

FACTS

I. ORIGINAL LEASE AND SUBSEQUENT RULE UPDATES

Jordan Robertson began living at Heritage Apartments, an apartment complex operated by Housing Kitsap, more than a decade ago in 2013. The lease Robertson signed included a "Rules and Regulations Attachment"[1] that stated, "The following portions of the property are no-smoking: a) common areas of the property and b) within 25 feet of the building(s) including entryways, balconies, and patios." Clerk's Papers (CP) (capitalization omitted) at 97, 99.

In 2015 or 2016, Robertson began a romantic relationship with Ray Jackson. Jackson was never formally added to Robertson's lease. The extent to which Jackson stayed over or resided at Robertson's apartment over the course of their relationship is unclear.

In 2016, Housing Kitsap adopted an updated "No Smoking Policy" that banned tenants and visitors from smoking "in common areas including the courtyard, balconies, parking area and

---

[1] Parties refer to this document as "house rules."

decks, in apartment units[,] or within 25 feet of any building associated with the property." CP at 96. The updated policy did not otherwise ban smoking in outdoor areas.

In 2018, Housing Kitsap updated its smoking policy again, modifying the house rules. The new smoking policy read:

> There is no smoking allowed in any common areas of the building. If you choose to smoke, please be considerate of your neighbors that do not smoke. Please do not allow your smoke to enter into other units through their windows, doors or other means. You cannot smoke within 25 feet of entrances, exits and windows that open per Washington State Law.

CP at 105. The new policy specified that tenants who caused damage to their unit because of smoking would be responsible for the cost of "restor[ing] the unit to [its] original condition." CP at 106.

The updated house rules also contained a policy on "Guests and Unauthorized Occupants" CP at 103 (capitalization and boldface omitted). The policy permitted guests to stay with the resident so long as their visit did not exceed "14 days and/or nights in a 45 day period" unless the resident got approval from management for a lengthier stay. *Id.* The policy stated that guests staying longer than that without approval would be considered "unauthorized occupant[s]." *Id.* Residents permitting unauthorized occupants to live in their apartments "could be subject to material non-compliance with the lease." CP at 104. Our record does not reflect that Robertson ever received a notice that Housing Kitsap believed she was not complying with the lease on this basis.

## II. FINAL UPDATE TO HOUSE RULES

At some point after 2018 and before 2024, Housing Kitsap updated its house rules again, including the smoking policy. Neither party disputes that this version of the policy was the one in

effect when Housing Kitsap gave Robertson notices of violation in 2024 and then sought to evict her. *See* Br. of Appellant at 7; Br. of Resp't at 4.

Washington's Residential Landlord-Tenant Act requires a residential landlord to identify at least four "substantial breach[es]" of a material term of the lease before initiating an eviction. RCW 59.18.650(2)(n)(i). The updated house rules generally used varying language to describe the severity of different types of violations, including "material violation," "minor lease violation," "serious violation," and simply "violation." CP at 114, 128. Neither party appears to dispute that a "serious violation" in the lease equates to a "substantial breach" of the lease requirements per the statute.

The new policy did not simply prohibit all smoking on Housing Kitsap property. Although previous versions of the smoking policy had been up to two paragraphs long, the new policy— titled "Smoke-Free Housing"—was extensive and spanned three and a half pages. CP at 126 (capitalization and boldface omitted). Moreover, the first paragraph lacks clarity because it appears to be missing some critical words, only listing locations on the Housing Kitsap property without saying that smoking is prohibited in these areas. The introductory paragraphs of the policy read as follows:

> Lit tobacco products and all smoking in any interior common areas, including but not limited to community rooms, community bathrooms, lobbies, reception areas, hallways, laundry rooms, electrical rooms and closets, storage units or rooms, stairways, offices, elevators and within all living units and [Public Housing Authority] administration office buildings and vehicles (in brief, a smoke-free policy for all indoor areas). *This policy extends to all outdoor areas (doors/entrances, windows, and porches)* and administrative office buildings and maintenance facilities.
>
> [The Department of Housing and Urban Development] is requiring implementation of smoke-free housing *to improve indoor air quality* in housing, benefit the health of tenants and staff, reduce the risk of catastrophic fires, and lower overall

4

maintenance costs. This policy applies to all tenants, tenant[s'] families, tenant[s']
guests, visitors, contractors, service personnel, and employees.

*Id.* (emphasis added). The introduction was followed by the following sections: "Purpose of
Policy"; "Definitions"; "Tenants Responsibilities and Lease Violations"; "Enforcement"; "Health
and Safety of Employees and Contractors"; and "Disclaimers and Representations." CP at 126-29
(boldface omitted).

The "Purpose of Policy" section stated that the rules were intended to mitigate the "health
effects of secondhand smoke[,]" improve the work environment for staff, minimize maintenance
costs, and "[d]ecrease the risk of . . . fires" as reasons for the policy. CP at 126-27.

The Definitions section defined "indoor areas" as "living units/apartments," which
included "indoor common areas, electrical rooms and closets, storage units or closets, community
bathrooms, lobbies, hallways, laundry rooms, stairways, offices, *sidewalks, parking areas* and all
[Public Housing Authority] administrative offices/buildings, [m]aintenance [f]acilities, and
vehicles.

CP at 127 (emphasis added). It defined "Common areas" as follows:

[A]reas that are open to all tenants, tenant[s'] families, tenant[s'] guests, visitors,
contractors, service personnel, employees, and members of the public. Common
areas include:
      a. Any inside space
      b. Entryways/Entrances
      c. Patios and Porches
      d. Lobbies
      e. Hallways and stairwells
      f. Management Offices
      g. Maintenance Offices and Inventory Areas
      h. Public restrooms
      i. Community rooms
      j. Community kitchens
      k. Lawns
      l. *Sidewalks and walkways within the development*

5

m. *Parking lots and spaces*
n. Creek area/greenbelt/creek bridge
o. Common areas also include any other area of the buildings or developments where tenants, tenant[s'] families, tenant[s'] guests, visitors, contractors, service personnel, employees, and members of the public may go.

*Id.* (emphasis added).

The first two paragraphs of the Tenants Responsibilities and Lease Violations section read as follows:

1) *Tenants are prohibited from smoking in or around all housing (doors/entrances, windows, and porches) and administrative office buildings and maintenance facilities.*

2) Tenants are responsible for the actions of their household, their guests, and visitors. *Any tenant, including the members of their household, guests, or visitors will be considered in violation of the lease if found smoking in any Housing Kitsap facility or apartment, or anywhere on Housing Kitsap property (all [Housing Kitsap] areas are deemed as non-smoking).* Visual observation of smoking is not necessary to substantiate a violation of this Smoke Free Housing Policy. For example, the presence of smoke, tobacco smoke odor, or smoke stains within an apartment in combination with butts, ash trays, or other smoking paraphernalia will be considered significant evidence of a policy violation. *Three (3) violations will be considered to be a serious violation of the material terms of the lease and will be cause for non-curable eviction.* In addition, tenant will be responsible for all costs to remove smoke odor or residue upon any violation of this policy.

CP at 128 (emphasis added). This section also stated that tenants were responsible for informing their guests "that their apartment complex is smoke free." *Id.*

In the Enforcement section, the policy stated that after the first offense, "the tenant will be counseled verbally by [Housing Kitsap] staff . . . to correct the violation, and also followed up with a letter to support the conversation." *Id.* The policy stated that "[t]he second and final documented occurrence will result in Lease termination in which the tenant will have 10 days to discuss this termination with the landlord with an informal hearing." *Id.* This clause in the smoking policy

6

apparently contradicted the second paragraph of the Tenants Responsibilities and Lease Violations section that stated that three violations would be considered a serious violation of the lease.

In the Disclaimers and Representations section, the policy stated that "[t]he Smoke Free Housing Policy does not mean that tenants and/or employees will have to quit smoking in order to live and/or work at the Housing Authority developments and offices or drive its vehicles." CP at 129. In that section, the policy also stated that "Housing Authority's adoption of the Smoke Free Housing Policy, and *the efforts to designate portions of developments as non-smoking* does not make the Housing Authority . . . the guarantor of . . . the smoke free condition of the non-smoking portions of developments." *Id.* (emphasis added). Similarly, it stated that "[t]he Housing Authority's adoption of a non-smoking living environment, and the *efforts to designate portions of its developments as non-smoking* does not in any way change the standard of care that the Housing Authority has under applicable law to render its developments any safer . . . than any other rental premises." *Id.* (emphasis added).

The new house rules additionally included a section titled "Abusive and Threatening Language and/or Behavior." CP at 110 (capitalization and boldface omitted). In that section, the policy stated that Housing Kitsap could issue a lease violation to a resident if they "demonstrate[d] abusive, threatening and/or unprofessional behavior in the presence of Housing Kitsap or other residents/applicants or service personnel on the property." CP at 111. The updated rules also included a slightly expanded section on "Guests and Unauthorized Occupants," but the basic rules from the 2018 update remained the same. *Compare* CP at 116 (capitalization and boldface omitted), *with* CP at 103.

III. ROBERTSON'S ALLEGED LEASE VIOLATIONS

In late 2023, Housing Kitsap hired Kisha Thomas as the new property manager overseeing Heritage Apartments. After several months of training, Thomas began citing residents for non-compliance issues in February 2024. On February 15, 2024, Thomas saw Robertson "smoking on the property" and "putting cigarettes into [her] coat pocket upon entry into the Heritage office." CP at 33. That same day, Thomas identified that Robertson's vehicle "failed to meet [the] Housing Kitsap lease agreement and house rules" and contacted a company to tow the car. CP at 38.

When the tow truck driver arrived and approached Robertson's vehicle, Robertson came out of her apartment and confronted Thomas. According to Thomas, Robertson "obstructed the tow truck driver," got in Thomas' face, and told Thomas that Housing Kitsap could not have her car towed because Robertson had lived on the property for a long time. CP at 44. As a result, Housing Kitsap issued Robertson three separate "30-Day Notice[s] to Comply with Lease or Quit Premises": one for smoking (Violation 1), one for using abusive language and interfering with management (Violation 2), and one for obstructing the tow truck driver (Violation 3). CP at 28 (capitalization and boldface omitted), 33, 38, 44. The notices related to the tow truck incident were also addressed to Jackson.

In April 2024, Thomas "observed [Robertson] smoking in front of [her] apartment." CP at 50. Housing Kitsap issued another 30-Day Notice to Comply with Lease or Quit Premises based on this violation (Violation 4).

In July 2024, Thomas again saw Robertson "smoking a cigarette on the Heritage property." CP at 57. According to Thomas, Robertson told Thomas that smoking was allowed on the property, that Robertson had never signed any agreement not to smoke on the property, and that she would

8

continue to smoke. That same day, Robertson was speaking to Thomas and the police "about a disturbance with a neighbor." CP at 62. According to Thomas, Robertson called Thomas "a [b***h] several times and a [b***h] [a**]," and "flip[ped] [Thomas] off." *Id.* Housing Kitsap issued two more 30-Day Notices to Comply with Lease or Quit Premises to Robertson and Jackson based on this behavior: one for smoking (Violation 5), and one for abusive language and interference with management (Violation 6).

The following month, Housing Kitsap sent Robertson and Jackson a "60-Day Notice to Terminate Tenancy for Multiple 30-Day Compliance Notices." CP at 5 (capitalization and boldface omitted). In the notice, Housing Kitsap stated that it had served Robertson with "at least four 30-Day Comply or Vacate Notices in the past 12 months" as required to initiate an eviction under RCW 59.18.650(2)(n)(i). CP at 5. It listed the six previously-described notices as the basis for its decision to terminate the lease.

IV. Unlawful Detainer Action

In November 2024, Housing Kitsap filed a complaint against Robertson and Jackson for unlawful detainer in superior court. A few weeks later, Robertson and Jackson requested and received appointed counsel pursuant to RCW 59.18.640(1). The trial court scheduled a show cause hearing for February 7, 2025.

The day before that hearing was set to occur, Robertson and Jackson filed a brief for the show cause hearing. In their brief, Robertson and Jackson argued that under Housing Kitsap's policy, "it is only the third [smoking] violation that would constitute a 'serious violation of the material terms of the lease'" and therefore Housing Kitsap could not actually identify four substantial breaches of the lease as required under RCW 59.18.650(2)(n)(i) to proceed with an

9

eviction. CP at 85. They further argued that even if each single smoking violation counted separately toward the statutory requirement, Housing Kitsap's smoking policy did not clearly ban all outdoor smoking, and that Housing Kitsap could not prove that Robertson had been smoking in the outdoor areas banned by the policy. Robertson and Jackson also argued in their brief that the notice citing Robertson for stating that "'[h]er car cannot be towed due to living [t]here for a long time'" failed to allege a clear lease violation. CP at 86 (first alteration in original). And they argued that Robertson would testify that she had not interfered with the tow truck driver, and that even if she had, this was not a violation of the lease.

The trial court continued the show cause hearing to February 21. On the day of that hearing, Housing Kitsap requested a continuance, which the trial court granted. The trial court ultimately held the show cause hearing on March 7.

Counsel for both parties made arguments. Counsel for Robertson and Jackson reiterated the argument that Housing Kitsap had not properly established the smoking violations because "the rules . . . refer constantly to indoor smoking and smoking adjacent to the buildings, whereas [Robertson] was observed smoking simply on the property, outdoors." Verbatim Rep. of Proc. (VRP) at 5.

After both counsel had made initial arguments, the following exchange occurred:

> [DEFENSE COUNSEL]: I would like, obviously, an opportunity to examine the witnesses.
> [PLAINTIFF'S COUNSEL]: An opportunity to what?
> THE COURT: To examine the witnesses. Did you -- okay. Do you want to respond to that?
> [PLAINTIFF'S COUNSEL]: Your Honor, this is not a witness calendar.
> THE COURT: It's not an evidentiary hearing, no.
> [PLAINTIFF'S COUNSEL]: Yeah. So the information is before the Court in the Declarations and the attachments to those Declarations.

10

With respect to the issue of what is and is not the smoking rules, the smoking rules clearly say you can't smoke anywhere on the property in the common area, and standing next to your front door is the common area. So these rules do apply and do apply to his client and so are violations subject to the issue of six Notices in the time period.

VRP at 5-6. Defense counsel responded by arguing again that the lease did not clearly ban smoking in all outdoor areas. And defense counsel stated that Robertson "could testify to the fact that she was smoking in the parking lot in an uncovered area . . . at least 25 feet away from any interior areas." VRP at 7. Defense counsel also argued that a first violation of the smoking policy is supposed to result in "a verbal warning, not a . . . Notice to Comply or Vacate." VRP at 8. Defense counsel did not mention his request to examine witnesses again.

The trial court concluded that the smoking ban in the updated lease rules "extend[ed] to all outdoor areas." VRP at 10. Defense counsel asked for clarification:

[DEFENSE COUNSEL]: [I]s it your position that you're interpreting this Lease that was drafted by the Plaintiff in the light most favorable to my client based on the ambiguity in the parentheses words?
THE COURT: I am, because it says "all outdoor areas," which it has clear meaning. And while they may further define it, I don't think there is a discrepancy as to outdoor areas. . . . I do understand that it's to be interpreted in the light most favorable to the tenant, but I don't know how you otherwise apply the phrase "all outdoor areas."
And additionally in the rules it indicates it's a smoke free environment and housing place.

VRP at 10-11.

The trial court found that five of the six violations were valid. It found that the violation alleging that Robertson had obstructed the tow truck driver was not valid. The trial court stated that it intended to sign the order granting Housing Kitsap a writ of restitution.

Either just before or just after the trial court signed the order, Jackson spoke to the trial court, stating that he wanted to clarify that he was not on the lease:

[PLAINTIFF'S COUNSEL]: I'm handing up that Order.
THE COURT: Thank you. All right. All right. Thank you everyone.
MR. JACKSON: I have a question.
THE COURT: And?
MR. JACKSON: I'm her boyfriend. And I was put on this piece of paper, but I'm just the boyfriend and I never agreed to pay anything. I'm not even on the Lease and I have my own place that I live at. . . . I don't formally live here and she's trying to put an eviction on my record when I don't live here. I'm not on the lease. I'm not on the paperwork.
THE COURT: And I don't have anything before me, Mr. Jackson, about that, so I can't deal with that today, because I don't have anything before me and there wasn't a response or anything provided to the other side --
MR. JACKSON: I made that clear to everybody, though.
THE COURT: to respond.
MR. JACKSON: I made that clear to the lawyer and I made that clear to her, because I don't -- I mean, what else can I do? I'm literally just the boyfriend. If she leaves, I leave. I'm not on the Lease. I'm not formally here. I have my own place that I live at with my own mail, with my own stuff.
THE COURT: All right. And I can appreciate that.
. . . .
THE COURT: But I don't have any of that in writing before me, so it's not before the Court today.
Thank you. That does conclude our calendar today.
MR. JACKSON: [S]o how do I address that then?
[DEFENSE COUNSEL]: We can deal with that separately, sir.

VRP at 11-13. The hearing then concluded.

The trial court's judgment awarded Housing Kitsap $7,986.00 plus interest in unpaid rent and directed the clerk of the court to issue a writ of restitution to have Robertson and Jackson removed from the premises.[2] The trial court also concluded that there was no disputed issue of material fact.

Robertson and Jackson timely appealed and obtained a stay pending appeal with a bond requirement. They argue that the trial court erred when it interpreted the smoking policy to ban all outdoor smoking on the property and when it considered the three smoking violations separately

---

[2] Unpaid rent was not a basis for the eviction.

rather than as one single substantial breach. They also argue that the trial court erred when it did not permit witness testimony at the hearing and when it declined to consider Jackson's defense that he was not actually a tenant of Housing Kitsap. Housing Kitsap requests attorney fees on appeal.

ANALYSIS

I. THE EVICTION PROCESS

A residential landlord can typically evict a tenant only for certain statutorily enumerated reasons. RCW 59.18.650(1)(a). A residential tenant can be evicted if "[t]he tenant continues in possession after having received at least 60 days' written notice to vacate" when the tenant has committed four "substantial breach[es] of a material term" of the lease agreement "within the preceding 12-month period." RCW 59.18.650(2)(n)(i). The parties agree that this was the statutory basis for Housing Kitsap's unlawful detainer action against Robertson.

The statute also requires a landlord to have provided the tenant with written notice "at the time of each violation" that "[s]pecif[ies] the violation[,]" explains that four violations could result in eviction, and provides "an opportunity to cure" if the violation was not the fourth within 12 months. RCW 59.18.650(2)(n)(i), (ii)(A)-(D).

If the tenant continues residing at the property in violation of the notice to vacate, the landlord can file an unlawful detainer action. *Kiemle & Hagood Co. v. Daniels*, 26 Wn. App. 2d 199, 211, 528 P.3d 834 (2023). An unlawful detainer action "provides an expedited method of resolving the right to possession of property" and is "[g]overned by chapters 59.12 and 59.18 RCW." *Randy Reynolds & Assoc. v. Harmon*, 193 Wn.2d 143, 156, 437 P.3d 677 (2019). The Residential Landlord-Tenant Act, codified in chapter 59.18 RCW, governs residential tenancies

specifically and supplants any contradictory provisions in chapter 59.12 RCW. *Id.* We construe both chapters "strictly . . . in favor of the tenant." *Id.*

A landlord commencing an unlawful detainer may also apply for a writ of restitution, which is "a legal remedy, ordered by the superior court and issued by the clerk's office, that allows the landlord to regain immediate possession of the property pending the court's issuance of a final judgment." *Egbert v. Jorgensen*, 36 Wn. App. 2d 1, 21-22, 580 P.3d 1002 (2025), *review granted*, No. 105112-3 (Wash. July 1, 2026). "To obtain a writ, a landlord must apply for an order for a show cause hearing" at which "the court will determine if the premises should be returned to the landlord." *Randy Reynolds*, 193 Wn.2d at 157. "Whether or not the court issues a writ of restitution at the show cause hearing, if material factual issues exist, the court is required to enter an order directing the parties to proceed to trial on the complaint and answer." *Id.*

II. ALLEGED BREACHES OF LEASE AGREEMENT

A.    Lease Interpretation Principles

We interpret a lease de novo using the principles of contract law. *Spokane Airport Bd. v. Experimental Aircraft Ass'n, Chapter 79*, 198 Wn.2d 476, 484, 495 P.3d 800 (2021); *Fitness Int'l, LLC v. Nat'l Retail Props., LP*, 25 Wn. App. 2d 606, 613, 524 P.3d 1057 (2023). Our primary objective is to determine the intent of the parties. *Spokane Airport Bd.*, 198 Wn.2d at 484. Washington follows the "objective manifestation theory of contracts[,]" under which we "determine . . . intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

"We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* at 504. "'A contract should be construed as a whole and, if reasonably possible, in a way that effectuates all of its provisions.'" *Fitness Int'l*, 25 Wn. App. 2d at 613 (internal quotation marks omitted) (quoting *Bellevue Square, LLC v. Whole Foods Mkt. Pac. Nw., Inc.*, 6 Wn. App. 2d 709, 717, 432 P.3d 426 (2018)). "We avoid interpreting . . . contracts in ways that lead to absurd results." *Forest Mktg. Enters. v. Dep't of Nat. Res.*, 125 Wn. App. 126, 132, 104 P.3d 40 (2005). "[I]f a lease is ambiguous, the court will adopt the interpretation that is most favorable to the lessee[,]" especially where the lessor drafted the agreement. *Carlstrom v. Hanline*, 98 Wn. App. 780, 785, 990 P.2d 986 (2000).

B.      Applicability of Smoking Policy to Outdoor Areas

Robertson argues that it is ambiguous whether the smoking policy incorporated into the lease permitted some outdoor smoking when read as a whole, even if certain quotations from the policy seem to suggest it imposed a categorical smoking ban when taken out of context. Robertson further claims that, had she been permitted to testify at the hearing, "she would have testified that on each of the occasions where she was observed 'smoking on the property,' she was in an uncovered area at least 25 feet away from any building." Br. of Appellant at 22 (quoting record). Robertson's counsel made a similar assertion in the hearing below, telling the trial court that Robertson would testify that she was smoking in an uncovered parking lot 25 feet away from all buildings.

Housing Kitsap maintains that the policy unambiguously banned smoking everywhere on the property, including all outdoor areas. It also argues that it implemented this policy in response to the passage of 24 C.F.R. § 965.653 and claims that when the lease is read in concert with that

regulation, it is clear that smoking was "never tolerated on the property." Br. of Resp't at 27. Under 24 C.F.R. § 965.653(a), public housing authorities "must design and implement a policy prohibiting the use of prohibited tobacco products in all public housing living units and interior areas . . . , as well as in outdoor areas within 25 feet from public housing and administrative office buildings." The regulation also states that public housing authorities "may choose to . . . make their entire grounds smoke-free." 24 C.F.R. § 965.653(b).

We agree with Robertson that reading the policy as a whole, it is ambiguous as to whether it banned all outdoor smoking because it contains conflicting provisions. And any ambiguity must be interpreted in the tenant's favor.

We acknowledge that there is some language in the policy that suggests it banned all smoking, including outdoors. For instance, the second paragraph in the Tenants Responsibilities and Lease Violations section stated, "Any tenant, including the members of their household, guests, or visitors will be considered in violation of the lease if found smoking in any Housing Kitsap facility or apartment, or anywhere on Housing Kitsap property (all [Housing Kitsap] areas are deemed as non-smoking)." CP at 128. And the trial court relied heavily on a phrase in the policy's introduction that extends it to "'all outdoor areas.'" VRP at 11 (quoting record).

But when read in context and as a whole, there are other provisions that seem only to ban outdoor smoking within 25 feet of buildings or in certain specifically delineated locations. As Robertson points out, if Housing Kitsap's intent was to create a complete and total smoking ban they could easily have done so with a single sentence banning smoking everywhere on Housing Kitsap property. Instead, Housing Kitsap's policy was nearly four pages long in total and included two paragraphs of preamble outlining the basic policy, a lengthy definitions section that clarified

what it meant when it used terms such as "indoor areas" and "common areas," and five paragraphs outlining tenant responsibilities related to smoking.

The passage from the introduction that the trial court relied on read in full, "This policy extends to all outdoor areas (doors/entrances, windows, and porches) and administrative office buildings and maintenance facilities." CP at 126. Without the parenthetical, one could read this sentence to ban all smoking outside on the property. But the included parenthetical referred to outdoor spaces and openings attached or close to the building itself. And "outdoor areas" was not otherwise defined by the policy, even though the policy contained a definitions section. As a result, the parenthetical could be read as limiting what outdoor areas the policy applies to.

The phrase in the Tenants Responsibilities and Lease Violations that indicated it was a lease violation to smoke "anywhere on Housing Kitsap property" was similarly preceded almost immediately by a contradictory statement that tenants merely may not smoke "in or around all housing (doors/entrances, windows, and porches)." CP at 127-28.

Additionally, the disclaimers section of the policy contained language that suggested smoking was not categorically barred everywhere on the property. The first disclaimer stated that the policy "does not mean that tenants and/or employees will have to quit smoking in order to live and/or work at the Housing Authority developments." CP at 129. Additionally, the second and third disclaimers both referred to Housing Kitsap's "efforts to *designate portions of developments as non-smoking*," again contradicting other policy language suggesting a total ban. *Id.* (emphasis added).

Housing Kitsap argues that because the policy defined "indoor areas" and "common areas" to include parking lots and sidewalks, we must interpret the policy as prohibiting all outdoor

17

smoking. The policy defined "indoor areas" as "living units/apartments[,] [i]ndoor common areas, electrical rooms and closets, storage units or closets, community bathrooms, lobbies, hallways, laundry rooms, stairways, offices, sidewalks, parking areas and all [Public Housing Authority] administrative offices/buildings, [m]aintenance [f]acilities, and vehicles." CP at 127.

The policy defined "common areas" as "areas that are open to all tenants, tenant[s'] families, tenant[s'] guests, visitors, contractors, service personnel, employees, and members of the public" and then listed 15 specific areas that qualify. *Id.* The list included the very broad "[a]ny inside space" but then also listed some specific, clearly indoor areas, such as "[l]obbies," "[p]ublic restrooms," and "[c]ommunity kitchens." *Id.* It also listed some spaces that are clearly outdoors, such as "[l]awns" and "[c]reek area/greenbelt/creek bridge." *Id.* It listed "[p]arking lots and spaces," notable because Robertson's counsel told the trial court Robertson could testify she was smoking in an uncovered parking lot 25 feet away from any building. *Id.*

As Robertson points out, it is possible to read the definition of "indoor areas" to include *covered* parking lots and sidewalks. This is especially true because interpreting it to mean that entirely uncovered, open-air parking lots and sidewalks qualify as "indoor" is an absurd result which we seek to avoid. *See Forest Mktg.*, 125 Wn. App. at 132. And interpreting the smoking ban provision to include only covered parking lots and sidewalks aligns with the policy's stated purpose of mitigating secondhand smoke exposure.

With regard to "common areas," the policy stated that smoking is prohibited only in "interior," "indoor," or "building" common areas. CP at 126-28. In the preamble, the policy referred to "interior common areas" and indicated that they were "smoke-free." CP at 126. In the same paragraph, the policy provided a non-exhaustive list of areas that are considered "interior

18

common areas," including "community rooms, community bathrooms, [and] lobbies." *Id.* All of the listed examples were clearly indoor areas. The policy also clearly banned smoking in all "indoor areas," the definition for which included "[i]ndoor common areas." CP at 127.

Because "common areas" was modified by the word "indoor" or similar whenever it was used in the context of describing where smoking was banned, the policy is best read as covering the areas listed in the common areas definition that are, in fact, indoors. Thus, smoking in outdoor areas such as the greenbelt or uncovered parking lots would not necessarily be prohibited because while those are "common areas," they are not "interior common areas." And even if the application of the smoking ban to outdoor common areas is merely ambiguous, we must read the ambiguity in favor of tenants.

Housing Kitsap's assertion that the lease clearly banned all smoking on the property when read alongside 24 C.F.R. § 965.653 does not persuade us. While that regulation permits public housing authorities to ban all smoking on their premises, it clearly does not *require* it. 24 C.F.R. § 965.653(b). Instead, it only requires public housing authorities to ban smoking in indoor areas and outdoor areas within 25 feet of buildings. 24 C.F.R. § 965.653(a).

Overall, because a holistic reading of the policy leaves room to interpret it as something less than a categorical ban, we hold that the policy is at minimum ambiguous. Because it is ambiguous, we construe it against Housing Kitsap, the lessor and drafter, and in favor of Robertson. Thus we hold that while the policy banned outdoor smoking within 25 feet of buildings, it did not clearly ban smoking in *all* outdoor areas, or in uncovered parking lot areas, for example. And because there was a material issue of fact as to where exactly Robertson was smoking— Robertson's counsel indicated Robertson "could testify to the fact that she was smoking in the

19

parking lot in an uncovered area [] at least 25 feet away from any interior areas"—we reverse the trial court's conclusion that no such issue of material fact existed as to whether Robertson actually violated the smoking policy.[3] VRP at 7.

C.      Requirements for Substantial Breach of Smoking Policy

Robertson also argues that even if the three violations of the smoking policy were valid, based on the terms of the lease they combine to make up one single substantial breach of the lease. Therefore, Robertson contends, Housing Kitsap can identify at best three substantial breaches— one smoking violation and two separate instances of harassing management—less than the four substantial breaches required by RCW 59.18.650(2)(n)(i) to initiate eviction proceedings. Robertson points out that the smoking policy stated that "[t]hree (3) violations will be considered to be a serious violation of the material terms of the lease and will be cause for non-curable eviction." CP at 128.

Housing Kitsap contends that Robertson misinterprets this provision. It points to the language immediately preceding the language Robertson quotes, within the same paragraph, which stated that management did not need to actually catch the tenant or their guest smoking to issue a violation if management discovered evidence such as "the presence of smoke, tobacco smoke odor, or smoke stains within an apartment in combination with butts, ash trays, or other smoking paraphernalia." *Id.* Housing Kitsap argues that in context, this paragraph meant that when management had never caught the tenant smoking but had found "three examples of this type of

---

[3] Housing Kitsap points to the letter it sent in 2015 updating its smoking policy to explicitly ban smoking in parking areas. But that smoking policy is no longer in effect; it was supplanted by a new policy in 2018, which was in turn replaced by the policy currently at issue. Neither the 2018 policy nor the current policy clearly banned smoking in parking areas.

evidence," they could issue a serious violation. Br. of Resp't at 28. In Housing Kitsap's formulation, then, catching someone smoking in person even once justified a serious violation.

We agree with Robertson's interpretation because the provision is, at minimum, ambiguous. The relevant paragraph reads in full:

> Tenants are responsible for the actions of their household, their guests, and visitors. Any tenant, including the members of their household, guests, or visitors will be considered in violation of the lease if found smoking in any Housing Kitsap facility or apartment, or anywhere on Housing Kitsap property (all [Housing Kitsap] areas are deemed as non-smoking). Visual observation of smoking is not necessary to substantiate a violation of this Smoke Free Housing Policy. For example, the presence of smoke, tobacco smoke odor, or smoke stains within an apartment in combination with butts, ash trays, or other smoking paraphernalia will be considered significant evidence of a policy violation. Three (3) violations will be considered to be a serious violation of the material terms of the lease and will be cause for non-curable eviction. In addition, tenant will be responsible for all costs to remove smoke odor or residue upon any violation of this policy.

CP at 128. It is not straightforwardly obvious that the sentences about what kind of evidence can support a violation provided a limitation on the rule about three violations constituting one serious violation. The provision can be easily read to mean that if management discovered smoke or smoke stains, as well as smoking paraphernalia in a tenant's apartment on one occasion, they could infer that the tenant was smoking and issue a violation.

Additionally, earlier in the same paragraph the policy stated that a tenant would be "considered in violation of the lease if found smoking"—notably, it did not say that this was a serious violation in itself. *Id.* It would be completely natural to read the entire paragraph, as Robertson does, to mean that it was a violation for a tenant to be found smoking, and that three such "violations" constituted one "serious violation."

The language in the Enforcement section of the smoking policy strengthens our conclusion that the policy is ambiguous. There, the policy stated that Housing Kitsap staff would verbally

21

counsel the tenant after the first smoking violation, and that after the "second and final" smoking violation, the lease would be terminated. CP at 128. This language appears to contradict the earlier paragraph that stated that three smoking violations would constitute one serious violation of the lease, creating additional ambiguity.[4]

Because these provisions are at minimum ambiguous, we interpret the smoking policy in the tenant's favor and hold that the policy made out each instance of smoking to be a violation, and that three smoking violations combined to constitute a single substantial violation. Under this reading, Robertson's three smoking violations constituted only a single substantial breach of the lease agreement, and by law, Housing Kitsap can identify only three substantial breaches of the lease agreement—one for smoking and two for abusive language—rather than the statutorily required four. We therefore reverse the trial court with instructions to dismiss the case, and we need not address Robertson's and Jackson's remaining contentions.

ATTORNEY FEES

Housing Kitsap asks for attorney fees on appeal. Because we reverse the trial court with instructions to dismiss the case, Housing Kitsap is not the prevailing party and is not entitled to attorney fees. Robertson does not request attorney fees on appeal.

CONCLUSION

We reverse and instruct the trial court to dismiss the unlawful detainer action.

---

[4] The rule laid out in the Enforcement section that purportedly allowed for termination of a tenant's lease after a second smoking violation also violates RCW 59.18.650(2)(n)(i), which requires at least four substantial breaches of the lease before a landlord can begin eviction proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

VELJACIC, C.J.

CHE, J.